IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Annette Simpson, | ) | C/A No.: 1:09-2731-HFF-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Michael J. Astrue, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation (Report) pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying her claim for Supplemental Security Income (SSI). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.    Relevant Background

A.    Procedural History

On March 17, 2004, Plaintiff protectively filed an application for SSI under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 1381-1383c, alleging she became disabled in March 2004. Tr. at 83–85. Her application was denied in initial and reconsideration determinations by Administrative Law Judge Drew Swank (referred to

herein as "ALJ Swank").  Tr. at 57, 59–60, 62–67, 69–71.  Plaintiff requested review, which the Appeals Council granted. Tr. at 31–33.  Pursuant to 20 C.F.R. § 416.1470, the Appeals Council vacated ALJ Swank's December 16, 2006 decision and remanded the matter, instructing the ALJ to provide the following: a more detailed evaluation of the opinions of Plaintiff's treating sources; additional consideration of Plaintiff's ability to work; and further evaluation of Plaintiff's credibility in light of her daily activities.  Tr. at 31–32.  The remand order also instructed the ALJ to obtain additional evidence regarding Plaintiff's impairments in accordance with regulatory guidelines and to obtain supplemental information from a vocational expert ("VE") if warranted.  Tr. at 32. The Order further indicated that the ALJ to whom the matter was remanded was to offer Plaintiff a new hearing, take any further action needed to complete the record, and issue a new decision.  Tr. at 33.

On remand, the case was assigned to a different ALJ (referred to herein as "ALJ"), who held a hearing on February 27, 2009.  Tr. at 643–75.  On March 18, 2009, the ALJ issued an unfavorable decision finding Plaintiff was not disabled because she retained the residual functional capacity ("RFC") to perform a significant number of jobs.  Tr. at 12–22.  The Appeals Council denied Plaintiff's request to review that decision, thereby making that the Commissioner's final decision for purposes of judicial review.  Tr. at 5–7.

B.    Plaintiff's Background and Medical History

Born November 2, 1959, Plaintiff was 44-years-old when she applied for SSI and 49 as of the date of the ALJ's decision.  Tr. at 83.  She graduated from high school.  Tr. at 648.

1.    Medical Evidence

a.    Headaches

In December 2003, Anthony May, M.D., evaluated Plaintiff for migraine headaches.  Tr. at 198.  Plaintiff told Dr. May she had been in a train accident in 1981, had suffered a head injury, and had a plate on the right side of her head.  Tr. at 198–99.  She indicated she had been in a coma for three months after the accident, and that she had begun having persistent headaches at that time.  Tr. at 198.  She described the headaches as always occurring on the right side of her head and having a throbbing quality.  Tr. at 198.  She said stress and bright light triggered the headaches and that over-the-counter medication temporarily resolved them.  Tr. at 198.  Dr. May noted that Plaintiff was wearing a cast on her left foot, but otherwise, his examination was normal.  Tr. at 199.  His impression was that Plaintiff experienced posttraumatic headache with some migraine features, and he prescribed medication.  Tr. at 199.  He noted that whether sinuses triggered the attacks was questionable and that it was possible the neuropathic pain resulted from the direct trauma to the skull and scalp.  Tr. at 199.  Plaintiff returned to Dr. May in April 2004 and reported that the medication made her headaches less severe.  Tr. at 197A.  In July 2004, Dr. May completed a brief questionnaire and indicated that Plaintiff's

thought process was intact, thought content appropriate, mood/affect normal, and attention/concentration and memory were good. Tr. at 197. He further noted that Plaintiff did not exhibit significant memory or concentration deficits. Tr. at 197.

In November 2005, Plaintiff saw John McBurney, M.D., for assessment of her headaches. Tr. at 328. She told him that she had experienced daily headaches for nearly 25 years, but was unable to give a detailed history of prior treatments. Tr. at 328. She also complained of memory problems. Tr. at 328. Dr. McBurney's physical and neurological examinations of Plaintiff were normal. Tr. at 328. His impression was that Plaintiff had posttraumatic vascular headaches, and he prescribed medication to treat them. Tr. at 328, 330.

On August 28, 2007, a CT scan of Plaintiff's head indicated some encephalomalacia and a cranioectomy defect, both of which were compatible with an old trauma. Tr. at 581. The CT scan indicated no acute findings. Tr. at 581.

In October 2007, Plaintiff saw John Absher, M.D., who practiced with Dr. May. Dr. Absher noted Plaintiff had not been to their office with complaints of headaches for three years. Tr. at 588. At the October 2007 visit, she indicated she had experienced a migraine headache that had lasted two to three days and that her migraine pain had worsened in the two to three weeks prior to that visit. Tr. at 588. Dr. Absher's examination of Plaintiff was normal. He prescribed medication for the headaches, and he ordered an MRI of the brain and other tests. Tr. at 588.

On November 2, 2007, Plaintiff returned to Dr. Absher to review the MRI. Tr. at 587. He indicated that the MRI results were "fairly unremarkable," and that the MRI revealed a "relatively large zone of encephalomalacia [], white matter T2 hyperintensities in the peroneal left frontal lobe inferior," and some post-operative changes. Tr. at 587. He noted that these "abnormalities" observed "were felt to be related to her surgical repair and the result of an old severe closed head injury." He noted "no acute structural abnormalities [] such as mass, tumor, or blood product." Tr. at 587. He noted that Plaintiff's headaches improved with medication. Tr. at 587.

In August 2008, Plaintiff returned to Dr. Absher for a follow-up appointment regarding her headaches. Tr. at 598. She reported that she continued to have headaches with "intense pain." Tr. at 598. Dr. Absher's impression was that Plaintiff's headaches were "stable," and that they were fairly well-controlled with medication. Tr. at 598.

In January 2009, Plaintiff reported to the emergency room complaining of headaches and sinus pain. Tr. at 566–69. She indicated that the headaches were a "new problem" that had begun in or around December 2008. Tr. at 567. She also reported that she had a history of migraines. Tr. at 567. She was prescribed medication and released. Tr. at 569.

b.      Sinusitis

Since at least 1997, Plaintiff received treatment for sinusitis. Tr. at 379–467. In July 2003, Plaintiff saw Dr. Julie Newburg for treatment of sinus issues. Tr. at 326. She noted that Plaintiff had polypoid tissue in her sinuses. Tr. at 326. She also noted that

Plaintiff had GERD (gastro-esophageal reflux disease), which "probably" contributed to her sinusitis. Tr. at 325. Dr. Newburg ordered a facial CT scan, which was performed on August 1, 2003, that indicated opacity in the mucosa right side of the maxillary sinus as well as signs of previous fracture and apparent healing. Tr. at 166.

In September 2003, Dr. Newburg operated on Plaintiff's sinuses, removing polyp tissue and sinus disease and suctioning excess mucus. Tr. at 161–62. Surgical notes indicated she had a history of facial trauma. Tr. at 161. Plaintiff tolerated the surgery well. Tr. at 162. In April 2004, Dr. Newburg examined Plaintiff, noting that she was generally doing well, but was complaining of difficulty with environmental allergens. Tr. at 319.

Beginning in January 2004, Plaintiff also sought treatment for sinusitis from Robert Mahon, Jr., M.D. Tr. at 310–13. Dr. Mahon noted that Plaintiff's nose was congested, her tonsils were swollen and tender, and she had "copious" sinus drainage. Tr. at 312. Dr. Mahon prescribed medication for Plaintiff's sinus issues. Tr. at 312. When Plaintiff saw him again in August 2004, he found that she was much improved. Tr. at 311. In early 2005, Dr. Mahon found that Plaintiff had problems with sinusitis and her allergies. Tr. 317–18. On June 30, 2005, Dr. Mahon indicated Plaintiff had obstructive sleep apnea. Tr. at 315. In July 2005, Dr. Mahon indicated that Plaintiff had acute allergic rhinosinusitis. Tr. at 314. She continued to complain of symptoms through 2008. Tr. at 493–507, 546–59, 562, 575.

In October 2008, Plaintiff went to the emergency room with saw with complaints of sinus pain that she indicated had a severity of ten on a one-to-ten scale. Tr. at 576. Her

symptoms included nasal congestion.  She had no shortness of breath or wheezing.  Tr. at 577.  Stuart Clarkson, M.D., diagnosed Plaintiff with seasonal allergic rhinitis. Tr. at 575.

            c.        Foot Pain

In August 2003, Plaintiff fractured her left foot at the base of the fifth metatarsal. She was placed in a cast and advised to use crutches.  Tr. at 378.  She did not use crutches, and she broke the cast in one week.  Tr. at 377.   She received a new cast and was advised not to bear any weight on that foot.  Tr. at 377.  She broke the cast again and received another one. Tr. at 376.

In October 2003, George Pattis, D.P.M., a podiatrist, noted that the fracture was stable and advised Plaintiff to wear a shoe for one hour per day. Tr. at 374.  Plaintiff re-fractured her foot in November 2003 because she had been walking barefoot, against medical advice.  Tr. at 372.  A month later, Dr. Pattis noted that Plaintiff had been advised not to bear weight on her foot, but that she walked eight to ten hours per day doing chores related to taking care of her children and housekeeping.  Tr. at 370.  X-rays showed that the fracture was not healing.  Tr. at 370.  On November 24, 2003, Dr. Pattis examined Plaintiff and noted that progress on the fracture's healing was slow.  Tr. at 371.  He indicated that if healing had not progressed when he rechecked the fracture, he would perform surgery on the fracture.  Tr. at 370.  Dr. Pattis recommended surgery, but Plaintiff indicated she needed to work and that she would not have the surgery at that time.  Tr. at 364.

In January 2004, Dr. Pattis again noted that the fracture had not healed and that Plaintiff had been noncompliant in that she had not been wearing her cast and had been fully weight bearing. Tr. at 359.  Plaintiff opted not to have surgery.  Tr. at 359. Three weeks later, Plaintiff indicated that she thought her foot was improving and noted that she could walk without a limp.  Tr. at 358.  In March 2004, x-rays indicated that the fracture was 75% healed. Tr. at 353.  By May 2004, Plaintiff had no significant complaints of pain while walking, and Dr. Pattis's clinical impression was that the fracture was resolving.  Tr. at 349.

        d.     Fibromyalgia

Plaintiff sought treatment for diffuse pain from Amir Agha, M.D., beginning in February 2005. Tr. at 490.  Dr. Agha's examination revealed tenderness in the fibromyalgia tender points, but the remainder of the examination was normal.  Tr. at 492. Dr. Agha's impression was fibromyalgia. Tr. at 492. Over the next three years, Dr. Agha continued to treat Plaintiff.  Tr. at 486–90, 540–45.  Plaintiff complained of pain in her arms, feet, and knees. Tr. at 486–90, 540–45, 564. During the time he treated Plaintiff, Dr. Agha generally noted that there was no change in Plaintiff's condition and that Plaintiff had muscle tenderness. Tr. at 486–90, 540–45, 564.

In March 2006, Dr. Pattis noted that Plaintiff had multiple trigger points on her feet, which Dr. Pattis noted was consistent with fibromyalgia on both feet. Tr. at 332. Two months later, Plaintiff requested narcotic medication, but Dr. Pattis did "not feel pain level was sufficient to merit [a narcotic]."  Tr. at 512.

2.     Opinion Evidence

In December 2004, D.S. Hopkins, M.D., a state agency physician, reviewed Plaintiff's medical records and assessed her RFC to work. Tr. at 302–08. Dr. Hopkins opined that Plaintiff could lift, carry, push and pull 20 pounds occasionally and ten pounds frequently; use her left leg for foot controls occasionally; sit about six hours in an eight-hour workday; stand or walk about six hours in an eight-hour workday; never climb ladders, ropes, and scaffolds; occasionally climb ramps and stairs, crawl, and stoop; and frequently balance, kneel, and crouch. Tr. at 302–03). He noted that Plaintiff had some limitations in her field of vision, had no communicative limitations, and had to avoid concentrated exposure to hazards and moderate exposure to fumes, odors, dusts, and gasses. Tr. at 304–05.

In March 2005, Dr. Pattis completed an RFC questionnaire for Plaintiff. Tr. at 341–44. He indicated that, because he was a podiatrist he would defer most questions to Plaintiff's physicians. Tr. at 341–44. He opined that Plaintiff could stand or walk about two hours in an eight-hour workday. Tr. at 342–43. He indicated her foot problems did not impact her ability to sit, but he deferred to her physicians on that issue. Tr. at 343. He opined she would have "good" and "bad" days, and he estimated she would be absent from work more than four days per month. Tr. at 344.

In October 2006, Dr. Ahga completed a Fibromyalgia RFC Questionnaire and indicated Plaintiff had symptoms of fibromyalgia. Tr. at 514. He indicated she was not a malingerer. Tr. at 514. He opined that Plaintiff's impairments "frequently" affected her

attention and concentration and that she could not tolerate even a "low stress" job.  Tr. at 515.  He estimated her functional limitations in a work environment as follows: she could not walk without significant pain, she could continuously sit for 75 minutes and stand for 65 minutes. Tr. at 515–16.  He opined that she could sit or stand/walk for fewer than two hours in an eight-hour workday. Tr. at 516.  He thought Plaintiff needed to be able to walk for five minutes every 30 to 45 minutes and needed a job that permitted shifting positions at will.  Tr. at 516. He also indicated Plaintiff could need to take two to three unscheduled breaks of 30 minutes to one hour during an eight-hour workday. Tr. at 516.  He thought she could lift up to ten pounds and was able to use her hands, fingers, and arms up to 50% of the day.  Tr. at 517. He indicated that Plaintiff's impairments would cause her to miss work more than four times per month.  Tr. at 518.

In February 2009, Dr. Pattis completed a Fibromyalgia RFC questionnaire. Tr. at 582–85.  He indicated that Plaintiff had "chronic mild plantar fasciitis," with painful trigger points in both feet, and fibromyalgia. Tr. at 582, 585.  He deferred to Plaintiff's other treating sources on many questions.  Tr. at 583–85.  He estimated Plaintiff could walk ten blocks and could stand more than two hours at one time and that she could stand or walk about four hours in an eight-hour work day.  Tr. at 584. In a letter written on the same day, Dr. Pattis wrote that Plaintiff's fasciitis would not preclude Plaintiff from working six to eight hours per day.  Tr. at 586.

C.    Hearing Testimony

1.    Testimony of Plaintiff

At the February 27, 2009 hearing, Plaintiff testified that she lived in a house with her 12-year-old daughter.  Tr. at 648.  She also testified about her past work at several fast-food restaurants and as a production worker with Goodwill Industries. Tr. at 648–53. She said that she collected unemployment benefits after she stopped working in 2003. Tr. at 649–50.  Plaintiff said that her health had become worse about four or five months before the hearing. Tr. at 653. She complained of fibromyalgia, sinusitis, and migraine headaches. Tr. at 653. She indicated that her migraine headaches, foot pain, and fibromyalgia were debilitating. Tr. at 654.  She said she had experienced headaches every day for years. Tr. at 667–68.  She said that she could be on her feet 20 to 30 minutes during a day and that she could not sit very long.  Tr. at 655, 658.  She said that she could stand or walk about ten or 15 minutes at one time. Tr. at 668.  She testified that medication provided her with some pain relief.  Tr. at 656.  She said she had trouble concentrating.  Tr. at 660. Plaintiff testified that her household chores included making the bed, cooking, washing dishes, and washing clothes. Tr. at 663. She said she was able to drive some days, but that some days she could not. Tr. at 664–65.  She said she prepared meals.  Tr. at 665.  She said she attended church approximately once a month. Tr. at 666.  She said that she folded clothes, ironed, swept, mopped, vacuumed, took out the trash, dusted, and cleaned.  Tr. at 667.

2.    Testimony of the Vocational Expert

VE Mark Leaptrot testified at the hearing.  Tr. at 669–75. The ALJ asked Mr. Leaptrot whether a person with the same vocational profile and the same RFC as Plaintiff could perform any work.  Tr. at 670–71.  He testified that such a person could not perform Plaintiff's past work, but would be able to perform the light, unskilled jobs of information clerk (2,400 jobs in the regional economy, 144,000 jobs in the national economy); box sealer inspector (1,150 jobs in the regional economy, at least 250,000 jobs in the national economy); and silverware wrapper (2,000 jobs in the regional economy, 89,000 jobs in the national economy).  Tr. at 671.  He said that his testimony was consistent with the DOT, except that the DOT descriptions of those jobs did not include a sit/stand option.  Tr. at 671.  He testified that he had observed those jobs and knew they could be performed with a sit/stand option.  Tr. at 672.

D.    The Decisions of the ALJs and the Order of Appeals Council

1.    The Decision of ALJ Swank

ALJ Swank found that Plaintiff was not disabled using the five step sequential evaluation. Tr. at 47–57.  At the first step of the sequential evaluation process, ALJ Swank found that Plaintiff had not engaged in substantial gainful activity since her alleged onset. Tr. at 49.  At the second step, the ALJ found that Plaintiff had severe impairments. Tr.  at 48.  At the third step, ALJ Swank found that Plaintiff's impairments did not meet or equal the Listing of Impairments (the "Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1. Tr. at 53. At the fourth step, ALJ Swank assessed Plaintiff's RFC, finding that she retained the RFC

for sedentary exertion with some non-exertional limitations.  Tr. at 53.  Continuing with the fourth step, ALJ Swank found that Plaintiff could perform her past work.  Tr. at 55. In an alternative finding, ALJ Swank found Plaintiff could perform other jobs at the light and at the sedentary exertional level.  Tr. at 56.  Based on these findings, ALJ Swank found Plaintiff was not disabled.  Tr. at 56.

### 2.    Order of Appeals Council

The Appeals Council granted Plaintiff's request for review of ALJ Swank's decision, vacated ALJ Swank's hearing decision, and remanded the case to another ALJ. Tr. at 31. The Appeals Council noted that ALJs Swank's decision did not evaluate opinions from Dr. Pattis and Dr. Agha; found that Plaintiff could perform sedentary work, but incongruously had only cited to light exertion jobs; and that he did not properly assess Plaintiff's credibility.  Tr.  31–32.  It instructed the new ALJ to evaluate treating source opinions; obtain additional evidence; properly evaluate Plaintiff's subjective complaints; and, if warranted, obtain additional evidence from a vocational expert. Tr. at 32–33.  The Appeals Council further instructed the ALJ to offer Plaintiff an opportunity for a hearing, take action to complete the administrative record, and issue a new decision.  Tr. at 33.

### 3.    The ALJ Decision

The ALJ found that Plaintiff was not disabled using the five-step sequential evaluation.  Tr. at 12–22.  At the first step of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her March 17, 2004 onset date.  Tr. at 14. At the second step, the ALJ found that Plaintiff had severe

impairments: headaches, degenerative disc disease of the back, fibromyalgia, and plantar fasciitis. Tr. at 14. At the third step, the ALJ found that Plaintiff's impairments did not meet or equal the Listings. Tr. at 16. At the fourth step, the ALJ assessed Plaintiff's RFC. Tr. at 17. He found that Plaintiff's subjective complaints were less than fully credible and determined Plaintiff retained the RFC to perform a range of work at light exertion level. Tr. at 17. Continuing with the fourth step, the ALJ found Plaintiff could not perform her past work. Tr. at 20. At the fifth step, relying on the testimony of the VE, the ALJ found that Plaintiff could perform a significant number of jobs that existed in the economy. Tr. at 20–21. Therefore, the ALJ found Plaintiff was not disabled. Tr. at 21. This appeal followed.

II.    Discussion

In her brief, Plaintiff lists the following reasons she claims that the Commissioner's findings are in error, stated verbatim:

1.    The ALJ's Decision Is Not Supported by Substantial Evidence

2.    The ALJ Erred at Step 2 of the Sequential Evaluation in the Determination of the Claimant's Severe Impairments and Failing to Find That the Claimant Had Severe Impairments of Being Status Post Severe Accident with Depressed Skull Fracture, Multiple Facial Fractures, Plate Insertion and Traumatic Headaches.

3.    The ALJ Erred in His Determination of Ms. Simpson's Residual Functional Capacity

4.    The ALJ Erred as a Matter of Law in Failing to Adhere to the "Law of the Case" Doctrine When the Case Was Remanded from the Appeals Council.

5.    The ALJ Erred in Failing to Order a Consultative Examination to Assess Claimant's Reported Cognitive Impairments in Light of the History of Severe Head Injury Requiring the Insertion of a Metal Plate, a Prolonged Coma, and Assertions of Impaired Memory and Concentration Affecting the Ability to Work.

6.    The ALJ Erred in Failing to Give the Treating Physicians' Opinion Significant Weight.

Pl.'s Br. at 1–2.  The undersigned notes that, although Plaintiff lists these six allegations of error on the first two pages of her brief, she does not submit argument or legal analysis on several of these issues.

The Commissioner counters that the ALJ did not commit reversible legal error and that his findings are supported by substantial evidence.

A.    ALJ Findings

In his March 18, 2009 decision, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since March 17, 2004, the application date (20 CFR 416.971 *et seq.*).

2.    The claimant has the following severe impairments: headaches, degenerative disc disease of the back, fibromyalgia, and plantar fasciitis (20 CFR 416.921 *et seq.*).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, SUBPART P, APPENDIX 1 (20 CFR 416.925 and 416.926).

4.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a wide range of light work. Specifically, the claimant can lift/carry 20 pounds occasionally and 10 pounds frequently, sit 6 hours in an 8 hour workday, stand 6 hours in an 8 hour workday, and walk 6 hours in an 8 hour workday. The claimant must

have a sit/stand option. She can stand/walk for up to 15 minutes at a time and sit for up to 1 hour at a time. She can never climb ladders, ropes, or scaffolds. She is limited to occasionally pushing and pulling with the lower extremities, climbing ramps and stairs, stooping and crawling. She is limited to no more than frequently balancing. She must avoid concentrated exposure to fumes and hazards.

5.  The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.  The claimant was born on November 2, 1959 and was 44 years old, which is defined as a younger individual age 18-49, on the date of the application was filed (20 CFR 416.963).

7.  The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10. The claimant has not been under a disability, as defined in the Social Security Act, since March 17, 2004, the date the application was filed (20 CFR 416.920(g)).

Tr. at 14, 16, 17, 20, 21.

B.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that, for eligible[1] individuals age 18 or older, benefits shall be available to those who are "under a disability," defined as one who is:

---

[1] Eligibility requirements for SSI focus on a claimant's income and are not at issue here. *See* 42 U.S.C. § 1382(a) (setting out SSI eligibility requirements).

unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. § 1382c(a)(3)(A).[2]

In evaluating whether a claimant is entitled to disability benefits, the ALJ must follow the five-step sequential evaluation set forth in the Social Security regulations. *See* 20 C.F.R. § 416.920. The ALJ must consider whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to her past work, and (5) if not, whether the claimant retains the capacity to perform specific jobs that exist in significant numbers in the national economy. *See id.*

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P,

---

[2] The standards for determining whether an adult claimant is "disabled" for purposes of being entitled to SSI are substantially the same as those for a claimant seeking disability insurance benefits (DIB) under the Act. *See* Frank S. Bloch, BLOCH ON SOCIAL SECURITY, §§ 2.1, 3.3 (2010).

App. 1; (4) whether such impairment prevents claimant from performing past relevant work (PRW); and (5) whether the impairment prevents her from doing substantial gainful employment.  *See* 20 C.F.R. § 416.920.  These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary.  20 C.F.R. § 416.920(a)(4) (providing that if Commissioner can find claimant "disabled or not disabled at a step," Commissioner makes determination and "do[es] not go on to the next step.").

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work.  *See* 20 C.F.R. § 416.920(a), (b).  The claimant bears the burden of establishing his inability to work within the meaning of the Act.

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy.  To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party."  42 U.S.C. § 405(g); *see* 42 U.S.C. § 1383(c)(3) (applying § 405(g) judicial review provisions to SSI matters).  The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case.  *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence."  *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence.  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Perales*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational.  *See Vitek v. Finch*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be

affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483

F.2d 773, 775 (4th Cir. 1972).

C.    Analysis

Plaintiff begins her brief with a list of six allegations of error, some of which

challenge whether the ALJ appropriately carried out the instructions of the Appeals

Council when it vacated the first decision and remanded the matter for further

proceedings, and some of which challenge the ALJ's specific findings.  The undersigned

will first consider Plaintiff's challenges regarding whether the ALJ appropriately followed

the Appeals Council's instructions on remand.

1.    The ALJ's Decision on Remand Appropriately Followed the Appeals
Council's Order and Applicable Regulations.

a.    Plaintiff's "Law of the Case" Argument is Without Merit.

In the ALJ's decision on remand, he independently evaluated evidence, conducted

another hearing, and issued his own decision finding Plaintiff not disabled for purposes of

receiving SSI.  The ALJ found that Plaintiff had the severe impairments of headaches,

degenerative disc disease of the back, fibromyalgia, and plantar fasciitis.  Tr. at 14.  He

found that Plaintiff had the RFC to perform the following:

> a wide range of light work. Specifically, the claimant can lift/carry 20
> pounds occasionally and 10 pounds frequently, sit 6 hours in an 8 hour
> workday, stand 6 hours in an 8 hour workday, and walk 6 hours in an 8 hour
> workday. The claimant must have a sit/stand option. She can stand/walk for
> up to 15 minutes at a time and sit for up to 1 hour at a time. She can never
> climb ladders, ropes, or scaffolds. She is limited to occasionally pushing and
> pulling with the lower extremities, climbing ramps and stairs, stooping and

crawling. She is limited to no more than frequently balancing. She must avoid concentrated exposure to fumes and hazards.

Tr. at 17.

In the earlier decision, ALJ Swank had found that Plaintiff had severe impairments of osteoarthrosis, chronic bronchitis, left foot fracture, allergic rhinitis, headaches, asthma, sleep apnea, fibromyalgia, diabetes, plantar fasciitis, and scoliosis.  T. at 49.  He had found Plaintiff had the RFC for the following:

> sedentary exertion, limited in climbing, crawling, should be environmentally fume free in the workplace, can perform 1-2 step instructions, and has limited interaction with the public.

T. at 53.

Plaintiff argues that the ALJ erred by finding Plaintiff's RFC was different from the RFC that ALJ Swank had ascribed to her.  Although she cites no statutory, regulatory, or case law to support her argument, Plaintiff claims that the "law of the case" required that the ALJ "let the opinion of [ALJ Swank] stand as to the RFC determination[.]" Pl.'s Br. at 17.  Plaintiff claims that the Appeals Council "did not disagree" with ALJ Swank's RFC determination and that the ALJ erred by providing a different one.

The Commissioner disagrees, arguing that the law of the case doctrine does not apply here.  Def.'s Br. at 10–11.  The undersigned agrees and recommends that this allegation of error be dismissed.

The law of the case generally provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the

same case." *Spencer v. Early*, 278 F. App'x 254 (4th Cir. 2008) (*citing Arizona v. California*, 460 U.S. 605, 618 (1983)).  Additionally, the law of the case does not apply to a situation in which a higher court vacates the decision of a lower court. *See Johnson v. Bd. of Educ. of City of Chicago*, 457 U.S. 52, 53–54 (1982) ("Because we have vacated the Court of Appeals' judgments in this case, the doctrine of the law of the case does not constrain either the District Court or, should an appeal subsequently be taken, the Court of Appeals."); *see also Adams v. Aiken*, 41 F.3d 175, 179 (4th Cir. 1994) ("Inasmuch as the Supreme Court vacated our judgment, we are not precluded from reconsidering [another issue not affected by the Supreme Court's mandate] in the light of the Court's most recent opinion.").

As an initial matter, the determination of a claimant's RFC is not purely a legal question, making the doctrine wholly inapplicable.  Further, the regulation under which the Appeals Council vacated and remanded the first decision provides in pertinent part that, on remand, the ALJ "shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeal Council's remand order." 20 C.F.R. § 416.1477(b).  Although the Appeals Council did not expressly order the ALJ to issue a new RFC, it vacated the initial decision, and instructed that, on remand, the ALJ consider additional evidence and re-evaluate findings related to Plaintiff's ability to work.  Tr. at 31–32.  Further, the Appeals Council did not expressly affirm the ALJ's RFC, leaving the ALJ free to reassess it on remand.  20 C.F.R. § 416.1477(b); *see also Powell v. Astrue*, C/A No. TMD 08-0840, 2010 WL 3245414, *3 (D. Md. Aug. 17, 2010)

(affirming ALJ decision and noting that ""regardless of whether the ALJ fully complied with the Appeals Council's remand order, judicial review is limited to the question of whether the ALJ's decision is supported by substantial evidence and reflects application of the correct legal standards.") (internal quotations omitted)).  The law-of-the-case doctrine is inapplicable here.

        b.      The ALJ Adequately Developed the Record.

In its order, the Appeals Council directed the ALJ to obtain evidence necessary to complete the record "in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 CFR 416.912–913)."  Tr. at 32.  Further, that Order provided that any such additional evidence "*may* include, if warranted and available," a consultative examination or medical source statements.  Tr. at 32 (emphasis added).

One of Plaintiff's allegations of error, as listed on the first page of her brief but not detailed within the brief, is that the ALJ erred by not obtaining additional medical evidence in the form of a consultative examination.  Pl.'s Br. at 1. In apparent support of that argument, Plaintiff provides excerpts of various medical records and highlights references to her 1981 accident, Pl.'s Br. at 6–11, and notes that the actual records from the 1981 accident are no longer available,  Pl.'s Br. at 7, n.2.

The undersigned finds this was not error.  The Appeals Council's order indicated that the ALJ "may" wish to obtain a consulting examination.  Pursuant to 20 C.F.R. § 416.919(a)(1), "[t]he decision to purchase a consultative examination for you will be

made after we have given full consideration to whether the additional information needed (e.g., clinical findings, laboratory tests, diagnosis, and prognosis) is readily available from the records of your medical sources." Further, a consultative examination may be obtained when "the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on your claim." 20 C.F.R. § 416.919(b)(1).

These regulations provide that the ALJ has discretion in determining when a consultative examination will be obtained. *See Bishop v. Barnhart*, 78 Fed. A'ppx 265, 268 (4th Cir. 2003) ("[T]he regulations state that the ALJ has discretion in deciding whether to order a consultative examination.") (*citing* 20 C.F.R. § 404.1519a and § 416.919a); *see also Singleton v. Barnhart*, 399 F. Supp. 2d 686, 691–92 (D.S.C. 2005) (finding no error in the ALJ's not obtaining consultative examination on remand from Order of Appeals Council).

In this case, all of the records to which Plaintiff points that refer to that accident and Plaintiff's potentially related injuries and treatments were already in the administrative record and available to the ALJ. None of the records indicate the treating sources making such record had incomplete information regarding that accident that made him or her unable to provide a diagnosis or prognosis. Further, the ALJ was aware of Plaintiff's prior accident and begins his discussion of Plaintiff's severe impairments by referencing it. Tr. at 14. (indicating that medical evidence "reveals the claimant complained of headaches since being involved in an accident in 1981"). Plaintiff has not demonstrated that there was a need for additional information regarding her accident.

Further, although Plaintiff does not expressly question this point, the undersigned notes that the ALJ considered additional medical evidence, citing to some medical records that post-date ALJ Swank's December 2006 decision. *See, e.g.,* Tr. at 15 (*citing* Dr. Absher's October 2007 records); Tr. at 16 (*citing* Dr. Agha's 2007 and 2008 records).

In addition, Plaintiff has not convincingly argued that a consultative examination would have resulted in any different determination, or explained the manner in which she was allegedly prejudiced by the ALJ's not ordering a consultative examination**.** *See Blalock,* 483 F.2d at 775 (noting plaintiff has the burden of proving disability). In this case, the undersigned's review of the whole record, which included information obtained after the Appeals Council's order, indicates that the ALJ did what that order required him to do. The undersigned recommends a finding that the ALJ did not err in this regard.

To the extent Plaintiff's argument may be construed as one that the ALJ did not adequately consider her past head injury and the alleged resulting impairment it caused, the court considers that argument in its review of the remaining limited question before the court—whether the ALJ's decision is supported by substantial evidence and applies proper legal standards.

    2.    The ALJ's Decision is Supported by Substantial Evidence.

        a.    The ALJ Adequately Considered Plaintiff's Claimed Impairments.

Plaintiff spends several pages of her brief cataloging references in medical records to trauma Plaintiff suffered in a March 1981 accident, noting that she has been unable to

obtain and provide the records of that accident.  Pl.'s Br. at 6–13.  She then states that she "has several problems that are directly related to the head injury," listing those problems as follows: "(1) reported impairment in memory; (2) post-traumatic headaches; and (3) reduction in visual field vision on the right eye."  Pl.'s Br. at 10.  She adds that the head injury and facial fractures "very likely affect the recurrence and severity of [her] sinus infections."  Pl.'s Br. at 10.  To the extent the argument is that the ALJ should have found that Plaintiff "had severe impairments of being post severe accident with depressed skull fracture, multiple facial fractures, plate insertion and traumatic headaches" (*id.* at 1), the undersigned finds that argument to be without merit.

The court's role in this judicial review of the record is to determine whether the ALJ's decision is supported by substantial evidence."  *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  The ALJ found Plaintiff's headaches to be a severe impairment. Tr. at 14.  As discussed below in considering Plaintiff's argument regarding her RFC, the undersigned is of the opinion that the ALJ's consideration of Plaintiff's headaches is supported by substantial evidence.  Additionally, the undersigned is of the opinion that the ALJ did not err in not designating as "severe" Plaintiff's claimed impairments of sinusitis, reduced vision field, or impaired memory.

To the extent Plaintiff is arguing that the ALJ erred by not finding sinusitis to be a severe impairment, the undersigned disagrees.  In his review of medical treatment Plaintiff had received, the ALJ noted that Plaintiff had received treatment for that

condition.  Tr. at 15.  He properly considered evidence regarding Plaintiff's sinusitis in determining her RFC.  Tr. at 15.

For an impairment to be "severe" means that the impairment at issue "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c).  Social Security Ruling ("SSR") 96-8p contemplates that a "severe" impairment "has more than a minimal effect on the ability to do basic work activities." SSR 96-8p. Plaintiff bears the burden of proving an impairment is "severe." *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5 (1987).

Nothing in the record indicates sinusitis limited Plaintiff's ability to perform basic work activities.  Although Plaintiff's brief includes general information regarding the anatomy of the sinuses and potential problems they may cause a person, she does not indicate what limitations sinusitis placed on her ability to work.  The only suggestion of any such limitation is Plaintiff's ad hoc argument that, if "you just ascribe" that one would be out of work for two days for a sinus infection and multiple the number of physician visits Plaintiff had by two, "clearly" Plaintiff would miss too much work because of her multiple illnesses.  Pl.'s Br. at 11–13.  This conjecture is not evidence. Additionally, at the February 27, 2009 hearing, Plaintiff did not testify that sinusitis kept her from working.  The undersigned is of the opinion that the ALJ did not err by not finding sinusitis to be a severe impairment.

Similarly, Plaintiff's argument that the ALJ erred by not including her claimed impaired vision field and impaired memory is without merit.  Regarding her vision,

Plaintiff cites to excerpts of records from Plaintiff's ophthalmologist that indicate she had an unspecified visual field defect and noting that defect and her headaches were likely related to her previous head injury.  Pl.'s Br. at 11 (*citing* Tr. at 191–92, 194).  However, Plaintiff makes no argument that issues with her visual field interfered with her ability to work, nor did Plaintiff mention any visual field issues in testifying about her claimed impairments.  *See* Tr. at 653–66.

In apparent support of her claim that the ALJ did not adequately consider her "impaired memory" and find it to be a severe impairment, Plaintiff cites to medical records that recite that she could not remember something.  *See* Pl.'s Br. at 10–11.  However, no medical records cited by Plaintiff or of which the court is aware indicates that Plaintiff's memory problems created any occupational limitations on her.  Again, Plaintiff has the burden of providing evidence to support her claims of disability.

Further, any error that could be ascribed to the ALJ's not finding sinusitis, reduced visual field, or impaired memory to be severe impairments was harmless.  The ALJ found other impairments "severe," so he continued the five-step analysis and considered all of Plaintiff's impairments in reaching his RFC determination.  *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (finding error harmless when ALJ would have reached the same result notwithstanding an error in his analysis).

c.     Plaintiff's RFC is Supported by Substantial Evidence.

Plaintiff's principal argument regarding her RFC is that the ALJ should have retained the RFC that ALJ Swank found Plaintiff to have in his December 16, 2006

decision.    As discussed above, the undersigned finds that argument without merit. Additionally, the ALJ's findings regarding Plaintiff's RFC, including his findings regarding Plaintiff's credibility, are supported by substantial evidence.

SSR 96-7p requires that, prior to considering Plaintiff's subjective complaints, the ALJ must find there is an underlying impairment that has been established by objective medical evidence that would reasonably be expected to cause the subjective complaints of the severity and persistence alleged. Only then is the ALJ to move to the second step: consideration of the record as a whole, including both objective and subjective evidence, to assess the claimant's credibility regarding the severity of her subjective complaints, including pain. *See* SSR 96-7p; *see also* 20 C.F.R. § 404.1529(b); *Craig v. Chater*, 76 F.3d 585, 591–96 (4th Cir. 1996).

The requirement of considering a claimant's subjective complaints does not mean the Commissioner must accept those complaints on their face. The ALJ may consider the claimant's credibility in light of her testimony and the record as a whole. If he rejects a claimant's testimony about her pain or physical condition, the ALJ must explain the basis for such rejection to ensure that the decision is sufficiently supported by substantial evidence. *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989) (*quoting Smith v. Schweiker*, 719 F.2d 723, 725 n.2 (4th Cir. 1984)). "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make

clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p.

Here, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms about which she complained. Tr. at 18. He then considered the credibility of Plaintiff's subjective claims in assessing her RFC. Tr. at 18–19. The court agrees with the Commissioner that the ALJ considered Plaintiff's claims, as appropriate, during his discussion of Plaintiff's RFC.

In assessing Plaintiff's credibility, the ALJ first considered Plaintiff's complaints that she had severe migraine headaches daily. *See* Tr. at 667–78 (Plaintiff's testimony regarding headaches). He found those complaints not credible however because they were inconsistent with the evidence. Tr. at 18. For example, when Plaintiff sought treatment for her sinusitis, she did not complain of headaches. *See* Tr. 314 (July 25, 2005 visit to ENT with complaint of severe nasal blockage; no mention of headache); *see also* 319, 325–26. However, when she saw neurologists Dr. May, Dr. McBurney, and Dr. Absher during the same time frame, she complained of frequent headaches. Tr. at 328 (Nov. 28, 2005 visit to neurologist with complaints of acute headaches); *see also* Tr. at 198, 588. Further, the ALJ noted the record contained conflicting information regarding Plaintiff's characterization of the length and severity of her migraines. Tr. at 18. She reported to Dr. McBurney that she had been having headaches for 25 years. Tr. at 328. She also has indicated that her headaches made her unable to function. *See* Tr. at 658. However, she told neurologists Drs. May and Absher that medication made her

headaches less severe. Tr. at 197A, 587. A condition that can be controlled with medication is not disabling. *See Gross v. Heckler*, 785 F.2d 1163, 1165 (4th Cir. 1986). Additionally, Dr. Absher's records indicated a three-year gap in Plaintiff's seeking treatment for headaches. Tr. at 588. Failure to seek medical treatment may support a finding that a claimant's impairments are not of disabling severity. *See Mickles*, 29 F.3d at 921 (claimant had not seen a doctor for over a year for her supposedly constant joint pain, and had made only one trip to the emergency room for her tension headaches).

Plaintiff has not established any error by the ALJ on this point. *See Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (finding claimant bears the burden of proof and production through step four of the sequential evaluation). In sum, upon consideration of all evidence and testimony the ALJ found that Plaintiff's complaints were not consistent with the medical evidence and were therefore not credible.

In evaluating Plaintiff's credibility, the ALJ also considered Plaintiff's subjective complains of severe, generalized pain. Tr. at 19. He noted that in July 2003, Plaintiff denied backache or arthritis. Tr. at 174. Further, Plaintiff was noncompliant with Dr. Pattis's advice that she not walk. Tr. at 370. In fact, she was walking eight to ten hours per day. Tr. at 370. Moreover, in November 2005, Plaintiff reported right leg pain, but denied other musculoskeletal pain. Tr. at 329. While examinations showed tenderness in the lower back and fibromyalgia tender points, neurological examinations and observations of her gait were normal. *See, e.g.*, Tr. at 329. Additionally, when Plaintiff

requested Lortab, Dr. Pattis thought her pain level was not sufficient to merit it. Tr. at 512. These inconsistencies undermined Plaintiff's credibility.

The ALJ may consider daily activities when assessing credibility. *Gross*, 785 F.2d at 1166. Here, the ALJ considered Plaintiff's testimony regarding her daily activities—including cooking, washing dishes, folding laundry, and cleaning—in determining she was not disabled. *See* Tr. at 19. The court finds that substantial evidence supports the ALJ's credibility determination. *See, e.g., Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005) (upholding ALJ's credibility determination that was partially based on claimant's "routine" daily activities including watching television, cleaning the house, caring for a pet, and managing household finances).

### d. The ALJ Properly Analyzed the Opinion Evidence.

In addition to considering Plaintiff's complaints, the ALJ considered the medical opinion evidence. In undertaking review of the ALJ's treatment of Plaintiff's treating physician, the court remains mindful that its review is focused on whether the ALJ's opinion is supported by substantial evidence and that its role is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Craig*, 76 F.3d at 589.

The ALJ noted that the state agency physician indicated Plaintiff could perform light work and that he gave that opinion significant weight. Tr. at 19; *see* Tr. 302–08. An ALJ must consider the findings of state agency physicians to be expert opinion evidence, and must explain in his decision the weight given to those opinions. *See* 20 C.F.R. §

416.927(f)(2); SSR 96-6p. The ALJ also noted Dr. Pattis's opinion that Plaintiff would miss more than four days of work per month and could only walk two hours in a workday. Tr. at 20; *see* Tr. 343–44. He gave little weight to the opinion because it was not supported by the evidence. Tr. at 20. For example, Dr. Pattis's treatment notes indicated that Plaintiff's plantar fasciitis improved with treatment and her gait and station were normal. Tr. at 349, 358. Further, the ALJ noted that Dr. Pattis's opinion was inconsistent with his opinion that Plaintiff had mild plantar fasciitis and that she could work six to eight hours a day. Tr. at 20; *see* Tr. at 586.

A physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence. *See Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(c)(2). The ALJ considered the record as a whole, reviewed Dr. Pattis's opinion and other records. In discounting Dr. Pattis's opinion regarding Plaintiff's functional abilities, the ALJ did what he was required to do—explain his reasons for discounting portions of the opinion. This was not error.

The ALJ also considered Dr. Agha's opinion that Plaintiff had extreme limitations and would miss four days of work per month. Tr. at 20; *see* Tr. 513–18. The ALJ gave the opinion little weight because he found it was not supported by the evidence. Tr. at 20. Again, a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence. *See Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(c)(2).

The ALJ noted that the limitations Dr. Agha opined Plaintiff had were not consistent with his own treatment notes, which indicated positive trigger points, but identified no other abnormalities.  Tr. at 20; *see* Tr. at 486–90, 540–45. The ALJ also noted that Plaintiff reported that her pain decreased with medication.  Tr. at 20; *see* Tr. at 656.

Additionally, the ALJ indicated that Dr. Agha seemed to have based his opinion more on Plaintiff's subjective complaints than the evidence in the record as a whole. Tr. at 20. The ALJ may give less weight to opinions that are based upon a claimant's subjective complaints.  *See Mastro*, 270 F.3d at 178 (noting fact treating physician's diagnosis based largely upon claimant's self-reported symptoms allowed ALJ to assign that physician's opinion lesser weight).  Accordingly, the ALJ conducted appropriate review of Dr. Agha's opinion and adequately explained his reasons for discounting it. Thus, the undersigned recommends dismissing Plaintiff's allegation that the ALJ erred in his treatment of the opinions of Dr. Agha and Dr. Pattis.

III.    Conclusion and Recommendation

Based on the above, the undersigned recommends that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

January 18, 2011                              Shiva V. Hodges
Florence, South Carolina                     United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**